**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

J.Q. DOE,                                          )
                                                   )
     Plaintiff,                                )
                                                   )     Case No. _____
     v.                                        )
                                                   )     April 26, 2019
ANDREA LYNNE BENOIT, in her                        )
personal capacity, 100 Oak Street,                 )
Braintree, MA 02184; JOHN DOE NOS.                 )
1 – 10, in their personal capacities; VICE         )
ADMIRAL DAVID H. LEWIS, in his                     )
his official capacity as Director of the           )
Defense Contract Management Agency,                )
3901 A Avenue, Fort Lee, VA 23801;                 )
DEFENSE CONTRACT MANAGEMENT )                       JURY DEMANDED
AGENCY; PATRICK SHANAHAN, in his )
official capacity as Acting Secretary of           )
Defense, 1400 Defense Pentagon,                    )
Washington, DC 20301-1400; and                     )
UNITED STATES DEPARTMENT                            )
OF DEFENSE.                                         )
                                                   )
     Defendants.                               )
_____ )

## COMPLAINT FOR MONETARY AND INJUNCTIVE RELIEF

**(Violation of the Freedom of Information Act, promulgation of a regulation unlawfully inconsistent with its authorizing Executive Order, Action Pursuant to _Sherley v. Sebelius_, 776 F. Supp. 2d 1 (D.D.C. 2011), and violation of Plaintiff's First and Fifth Amendment Rights, Action Pursuant to _Bivens v. Six Unknown Named Agents_, 403 U.S. 388 (1971)).**

1.     This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552

to order the production of an investigation report of concerning the Plaintiff, and additionally, of

other documentation concerning the Defense Contract Management Agency's ("DCMA")

practices for hiring its attorneys.

2.          This is also an action for DCMA's unlawful promulgation of a regulation, DCMA

Instruction 563, that was inconsistent with Executive Order 13,587.[1]

3.          This is also a *Bivens* action for Andrea Lynne Benoit's ("Benoit") violation of

J.Q.'s First Amendment right to free speech and violation of the Fifth Amendment for stigma-

plus harm caused by the malicious and unnecessary submission of a report by Benoit and

unknown DCMA employees (John Doe Nos. 1-10), to J.Q.'s current employer concerning the

unlawful DCMA insider threat investigation of J.Q.,[2] thereby suggesting to J.Q.'s current

employer, and to the Department of Defense Office of General Counsel that J.Q. at one time

posed an insider threat, even though DCMA had already determined J.Q. never posed any insider

threat.

<u>**Jurisdiction**</u>

4.          This Court has subject matter jurisdiction over the FOIA actions and personal

jurisdiction over Defendants DCMA and the United States Department of Defense ("Department

of Defense," "Defense Department," or "DoD"), pursuant to 5 U.S.C. § 552(a)(4)(B) and to 28

U.S.C. § 1331.

5.          This Court has subject matter jurisdiction over the FOIA actions and unlawful

promulgation of DCMA Instruction 563, and personal jurisdiction over Defendants DoD,

DCMA, Patrick Shanahan, and U.S. Navy Vice Admiral David Lewis, per 28 U.S.C. § 1331.

---

[1] A regulation that is inconsistent with an executive order that authorizes its promulgation is unlawful. *Sherley v. Sebelius*, 776 F. Supp. 2d 1, 23 (D.D.C. 2011); *accord Peters v. Hobby*, 349 U.S. 331, 345-46 (1955). In DCMA Manual 3301-05, DCMA canceled DCMA Instruction 563 and asserted that its purpose in issuing DCMA Manual 3301-05 was to establish DCMA's compliance with Executive Order 13,587.

[2] DCMA had already determined by January 2017 that J.Q. was never an insider threat.

6.      This Court has subject matter jurisdiction over the *Bivens* action and personal jurisdiction over Defendant Benoit and one or more unidentified DCMA employees (John Doe Nos. 1-10) pursuant to 28 U.S.C. § 1331 and, alternatively, per 28 U.S.C. § 1367.

## Venue

7.      Venue is appropriate under 5 U.S.C. § 552(a)(4)(B).

8.      Venue is also appropriate under 28 U.S.C. § 1391 because one Defendant, the Department of Defense, is located in the District of Columbia.

## Parties

9.      Plaintiff J.Q. Doe ("J.Q."), a citizen of Virginia, is a loyal American, a dedicated Defense Department attorney, and a former DCMA employee.

10.     Defendant Benoit, a citizen of Massachusetts, is the Counsel for the DCMA Eastern Regional Command, and is named in this action in her individual capacity.  Benoit was briefly J.Q.'s supervisor prior to May 2016, but was not J.Q.'s supervisor when, as described below, Benoit committed unlawful acts in violation of Plaintiff J.Q.'s civil liberties and Constitutional rights.

11.     Defendants John Does Nos. 1 – 10, are believed to be DCMA officials and employees and are anonymously described in this action in their individual capacities.

12.     Defendant Department of Defense is an agency of the United States Government and is charged with coordinating and supervising all agencies and functions of the government relating directly to national security and the United States Armed Forces.  The DoD maintains its principal office and place of business at 1400 Defense Pentagon, Washington, DC 20301-1400. DoD is also an agency within the meaning of 5 U.S.C. § 552(e) and is in possession and/or control of the records requested by Plaintiff that are the subjects of this action.

3

13.     Defendant DCMA is an agency of the United States Government organized by the authority of the DoD and is a component of the DoD, which works directly with defense suppliers to help ensure that DoD, federal, and allied government supplies and services are delivered on time, at projected cost, and meet all performance requirements.  The mission of DCMA, a Defense agency, includes the performance of Contract Administration Services (CAS) for the DoD and other authorized Federal agencies, i.e., overseeing and managing defense contracts executed by the United States Government.  DCMA is also an agency within the meaning of 5 U.S.C. § 552(e) and is in possession and/or control of records requested by Plaintiff that are the subjects of this action.  DCMA maintains its FOIA compliance office at Building 10500, 3901 A Avenue, Fort Lee, Virginia 23801-1806.

14.     Defendant Patrick Shanahan is named in this action in his official capacity as Acting Secretary of Defense.

15.     Defendant Vice Admiral David Lewis is named in this action in his official capacity as Director of DCMA.

## Exhaustion of Remedies

16.     On February 14, 2019, Plaintiff filed a Disclosure of Information with the U.S. Office of Special Counsel concerning DCMA's unlawful promulgation of DCMA Instruction 563 and concerning the actions of Benoit and John Does Nos. 1 – 10 in notifying Plaintiff's current employer about an insider threat investigation of Plaintiff conducted from November 2016 to January 2017 despite the investigators having found she was not an insider threat.

17.     On February 26, 2019, the OSC Disclosure Unit notified Plaintiff that the Disclosure Unit would not be further reviewing Case No. DI-19-2041.

4

## **National Insider Threat Policy and Executive Order 13,587**

18.     In October 2011, President Barack Obama issued Executive Order 13,587 establishing the National Insider Threat Task Force (NITTF) under joint leadership of the United States Attorney General and the Director of National Intelligence.[3]

19.     President Obama directed Federal departments and agencies with access to classified information to establish insider threat detection and prevention programs, and the NITTF to assist agencies in developing and implementing these programs.  [4]

20.     President Obama required that agencies "bear primary responsibility" for implementing "structural reforms" to "ensure responsible sharing and safeguarding of classified information on computer networks *... consistent with appropriate protections for privacy and civil liberties*."[5]

21.     In November 2012, following an extensive interagency coordination and vetting process, President Obama issued the National Insider Threat Policy and the Minimum Standards via a Presidential Memorandum.[6]

22.     An "insider" is anyone who has authorized access to DoD resources by virtue of employment, volunteer activities, or contractual relationship with DoD.[7]

---

[3] Exec. Order No. 13,587, Structural Reforms to Improve the Security of Classified Networks and Responsible Sharing and Safeguarding of Classified Information, 76 Fed. Reg. 63,811 (Oct. 7, 2011).

[4] *Id*. § 2.1(b).

[5] *Id.* § 1 (emphasis added).

[6] Presidential Memorandum for the Heads of Exec. Dept's and Agencies, Nat'l Insider Threat Pol. and Minimum Standards for Exec. Branch Insider Threat Programs, 2 Pub. Papers 1815 (Nov. 21, 2012), *available at* https://www.govinfo.gov/content/pkg/PPP-2012-book2/pdf/PPP-2012-book2-doc-pg1815.pdf

[7] Dep't of Def. Instruction 5240.26 (May 4, 2012); *accord Nat'l Insider Threat Policy*, Office of the Dir. of Nat'l Intell. at 4, https://www.dni.gov/files/NCSC/documents/nittf/National_Insider_Threat_Policy.pdf

23.     An "insider threat" is a person with authorized access, who uses that access, wittingly or unwittingly, to harm national security interests or national security through unauthorized disclosure, data modification, espionage, terrorism, or kinetic actions resulting in loss or degradation of resources or capabilities of the United States.[8]

24.     An insider threat can cause damage to the United States through embezzlement, espionage, terrorism, unauthorized disclosure of national security information, or through the loss or degradation of departmental resources or capabilities. [9]

25.     One kind of an insider threat is an employee with classified or sensitive information, or other inside information concerning security practices, data, and computer systems, who sells or gives such information to America's enemies, to criminals, or to terrorists, in violation of federal criminal statutes such as 18 U.S.C. §§ 37, 113B, 521, 1961, or 2331.[10]

26.     Infamous examples of insider threats in Federal agencies include former solider Chelsea (formerly Bradley) Manning, a former soldier convicted of violating the Espionage Act for disclosing nearly 750,000 classified or sensitive military and diplomatic documents to WikiLeaks, former CIA government contractor Edward Snowden, who copied and leaked classified National Security Agency information to journalists, Navy analyst Jonathon Pollard, who transmitted classified information to Israel, Robert Hanssen, a Cold War FBI supervisor who handed classified information to the Soviet Union, and Aldrich Ames, a CIA turncoat.[11]

---

[8] DODI 5240.26.

[9] *Nat'l Insider Threat Policy*, Office of the Dir. of Nat'l Intell. at 4, https://www.dni.gov/files/NCSC/documents/nittf/National_Insider_Threat_Policy.pdf

[10] DCMA Instruction 563.

[11] Defense Intel Alumni Assoc., *A Look at Insider Threats, Tradecraft, Motivations and Personalities of Some of the Most Notorious Traitors in History*, http://www.diaalumni.org/images/A_Look_at_Insider_Threats.pdf

27.     The impetus for Executive Order 13,587 were Snowden's and Manning's leaks of classified information.[12]

28.     Insider threats are vilified, despised, and regularly subjected to death threats from government officials and private citizens alike.[13]

29.     Both Republican and Democratic Senators were afraid that federal officials could misuse the Insider Threat Program to abuse federal employee whistleblowers who are not insider threats. "This really has the potential for abuse, and I think it could have a chilling effect on the public's right to know and effective oversight of our government," U.S. Senator Ron Wyden (D) said.[14]  "The Insider Threat Program has the potential for taking the legs out from underneath all of the whistleblower protections we have," U.S. Senator Chuck Grassley (R) said.[15]

**<u>Whitney Krause's and Tina Slicker's unethical, dishonest, and criminal misconduct at the DCMA Manassas Contract Management Office</u>**

30.     Christina "Tina" Slicker, a procurement law attorney, was an Associate Counsel at the DCMA Manassas Contract Management Office ("CMO").[16]

---

[12] Scott Higham, *Nat'l Security Initiatives Have Chilling Effect on Whistleblowers*, Wash. Post, July 23, 2014, *available at* https://www.washingtonpost.com/world/national-security/intelligence-security-initiatives-have-chilling-effect-on-federal-whistleblowers-critics-say/2014/07/23/c9dfd794-0ea0-11e4-8341-b8072b1e7348_story.html?utm_term=.b24fa9e79e38.

[13] Kristine Phillips, *Trump once demanded Edward Snowden's execution for giving 'serious information' to Russia*, Wash. Post, May 16, 2017, *available at* https://www.washingtonpost.com/news/the-fix/wp/2017/05/16/trump-once-demanded-edward-snowdens-execution-for-giving-serious-information-to-russia/?noredirect=on&utm_term=.b7918ce2a68c; Nima Shirazi, *If Words Court Kill*, Foreign Pol'y J., Dec. 17, 2010, *available at* https://www.foreignpolicyjournal.com/2010/12/17/if-words-could-kill-those-bloodthirsty-americans-and-their-death-threat-duplicity/ (former Arkansas governor Mike Huckabee told reporters, "Whoever in our government leaked that is guilty of treason, and I think anything less than execution is too kind a penalty.").

[14] Higham, *Nat'l Sec. Initiatives Have Chilling Effect on Whistleblowers*, Wash. Post, July 23, 2014.

[15] *Id.*

[16] In or around 2014, DCMA physically relocated the DCMA Manassas CMO from a building in Manassas, Virginia, to the second floor of 14501 George Carter Way in Chantilly, Virginia.  This CMO, despite now being located in Chantilly, Virginia, is still called the DCMA Manassas CMO.

31.     On unspecified dates, Associate Counsel Slicker was caught spending several hours at the CMO using her DCMA-issued computer to play one of many iterations or versions of video-game "app" "Candy Crush."[17]   Associate Counsel Slicker never received leave to play "Candy Crush" at work.

32.     Per Guideline M ("Misuse of Information Technology Systems") spending hours playing an unauthorized video-game "app" on a Government computer is an impermissible misuse of a Federal government information technology system.[18]

33.     Whitney Given Krause, an attorney licensed in Massachusetts, is the ethics and employment law attorney at the DCMA Manassas CMO.

34.     On knowledge and belief, Whitney Krause reported Slicker for time card fraud.

35.     Ms. Slicker subsequently spent several months away from the DCMA Manassas CMO before returning to work there again as an Associate Counsel, in or around 2014 or 2015.

36.     Many of Slicker's legal clients expressed that they were "terrified" of Slicker due to her abusive and demeaning responses to their legal questions.

37.     Ms. Krause has been a member of the Massachusetts Bar since 1991.

38.     According to Massachusetts Rule of Professional Conduct 8.4:

It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation … or (h) engage in any other conduct that adversely reflects on his or her fitness to practice law.

---

[17] At the time, "Candy Crush" was reputedly the most popular online video game played by women between the ages of 25 and 55. Jill Foster, *How women blow £ 400,000 a day playing Candy Crush, the most addictive online game ever*, *Daily Mail*, Oct. 16, 2013, *available at* http://www.dailymail.co.uk/femail/article-2463636/How-women-blow-400-000-day-playing-Candy-Crush-addictive-online-game-ever.html.

[18] 32 C.F.R. § 147.15(b)(3) (security concerns are raised by an employee's use of software from any unauthorized information technology system).

39.     In or around 2013 or 2014, Krause allegedly operated an eBay business using a physical office or offices and other government resources at the DCMA Manassas CMO.

40.     Conversion of Government property carries a jail term of one to ten years.[19]

41.     Between 2012 and 2014, Ms. Krause daily displayed a disabled parking windshield placard in her vehicle when parking in disabled parking spaces outside the CMO.

42.     Ms. Krause is not afflicted by a physical disability that impairs her ability to walk.

43.     The disabled parking windshield placard had been issued to Krause's father, who lives in a nursing home in Williamsburg, Virginia, two hours from the DCMA Manassas CMO, and who does not see Krause on a daily basis.

44.     Ms. Krause has neither carpooled nor transported her father (or any other person whose disability or disabilities impaired his or her ability to walk) to or from work at the DCMA Manassas CMO.

45.     The vehicle Ms. Krause drove to work between 2012 and 2014 was owned by either Ms. Krause or her then-husband, and was not owned or leased to an organization that provided transportation to persons whose disabilities impair their ability to walk.

46.     Each State issues special license plates and windshield placards for vehicles registered in the name of the license plate or placard applicant that permit the vehicle to park in a parking space reserved for persons with disabilities that limit or impair their ability to walk.[20]

47.     In Virginia, an application for such a handicapped parking license plate or placard must be accompanied by the certification of a licensed physician that the placard or license plate

---

[19] 18 U.S.C. § 641.

[20]  23 C.F.R. §§ 1235.3, 1235.4.

is intended for a vehicle used to transport a person with one or more disabilities that limit or impair that person's ability to walk.[21]

48.     The unauthorized use of disabled parking license plates or placards is prohibited in the Commonwealth of Virginia.[22]

49.     A person without a disability limiting or impairing his or her ability to walk is not permitted to park his or her vehicle using a disabled parking license plate or placard except when transporting a disabled person in the vehicle.[23]

50.     Illegally parking a vehicle in a space reserved for persons with disabilities is punishable by a fine or not less than $100 nor more than $500.  *Id.*

51.     A person who makes a false statement of material fact to obtain or assist an individual in obtaining a disabled parking license plate, who sells or exchanges a disabled license plate or placard for consideration, or who displays a counterfeit disabled parking license plate shall be guilty of a Class 2 misdemeanor in the Commonwealth of Virginia.[24]

52.     Massachusetts Rule of Professional Conduct 8.4(c) states that "[i]t is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

53.     "[I]n the course of representing a client, a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person." [25]

---

[21] *Id.*

[22] Va. Code § 46.2-1250.

[23] Va. Code § 46.2-1242(A)(1).

[24] Va. Code §§ 46.2-1248, 1251, 1252.

[25] Mass. Rules of Prof'l Conduct, S.J.C. Rule 3:07, Rule 4.1(a).[25]

54. Although Whitney Krause, Assistant General Counsel Katie O'Connor, and Assistant General Counsel Tiffany Koogler all reported directly to Eastern Regional Command Counsel JeanMarie Faris, Krause was the DCMA Manassas CMO legal office team leader, with authority over Ms. O'Connor and Ms. Koogler.

55. On an unspecified date in 2013 or 2014, Krause's husband left Krause for another woman.

56. On virtually a daily basis afterwards, Krause forced her two subordinates, Ms. O'Connor and Ms. Koogler to have hours of conversations with Krause about her departed husband and about a variety of other subjects unrelated to work, including but not limited to Krause's claim to have contracted a venereal disease from her then-husband.

57. Ms. Krause directed Ms. Koogler to review photos of numerous "hostesses" and women connected to her husband's www.linkedin.com account who Ms. Krause believed were having sex with him.

58. Hence, in 2013 and 2014, Ms. Krause often daily worked less than a full work day.

59. Ms. Krause never requested leave for the aforementioned non-work activities.

60. Ms. Krause nevertheless reported to DOD that she worked 40 hours each week.

61. For several years, Whitney Krause has served as the head interview panelist during panel interviews for attorney positions in the DCMA Eastern Regional Command. Krause continued to serve in this role even after 2013, when DCMA legal management became aware of many credible allegations of criminal conduct against Ms. Krause described herein.

62. Ms. Krause once remarked that she would never hire a graduate of a Historically Black College or University (HBCU).

63.     While ostensibly working, Krause frequently used her DCMA-issued computer to view YouTube.com videos making fun of African-Americans.[26]

64.     Ms. Krause often laughed so loudly while watching these and similar "humorous" videos that she disturbed O'Connor and Koogler from working and could even be heard outside the legal suite.

65.     Krause regularly used her DCMA-issued computer to blast, also quite loudly, "The Rush Limbaugh Show" radio broadcast in the DCMA Manassas CMO legal suite.  Rush Limbaugh, a nationally-syndicated broadcast radio host, is well-known for often making derogatory, racially offensive statements that disparage African-Americans.[27]

66.     On several unspecified dates, DCMA non-management employees visited Whitney Krause at the DCMA Manassas CMO legal suite to seek advice concerning their employment law disputes with their supervisors or other managers.

---

[26] Videos Krause viewed included "Key and Peele - Substitute Teacher," YouTube.com, https://www.youtube.com/watch?v=Dd7FixvoKBw (comedian Keegan-Michael Key portrays African-American inner-city substitute teacher "Mr. Garvey," who speaks "Ebonics" and struggles to correctly pronounce his upper middle-class Caucasian students' names); "Ain't Nobody Got Time for That!-Original," YouTube.com, https://www.youtube.com/watch?v=zGxwbhkDjZM (a viral video of an interview of jovial ghetto resident Kimberly "Sweet Brown" Wilkins speaking in "dialect" following a fire in her apartment complex).

[27] During a July 17, 2013 broadcast, Limbaugh made fun of deceased Trayvon Martin's girlfriend, Rachel Jeantel by bragging that he would now use the racial epithet "n***a," after Jeantel opined in a televised interview that the word referred to "any man" without regard to race.  *Rush Limbaugh: 'I Can Now' Say 'N---a,' Huffington Post*, Sept. 15, 2013, https://www.huffingtonpost.com/2013/07/16/rush-limbaugh-nigga_n_3605660.html.  In 2015, Limbaugh claimed that the role of James Bond could not go to British actor Idris Elba because, of course, Elba is black. Williams Endicott, *Limbaugh and the spy who shouldn't be black, Sacramento Bee*, Jan 3, 2015, *available at* https://www.sacbee.com/opinion/california-forum/article5199246.html.

67.     According to Massachusetts Rule of Professional Conduct 4.3(a), "In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding."

68.     According to Massachusetts Rule of Professional Conduct 4.3(b), "During the course of representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the client."

69.     Ms. Krause, who is employed as an attorney by DCMA, is a fiduciary of DCMA, and not a fiduciary of any individual DCMA employee.

70.     Krause never told the DCMA non-management employees who sought her labor and employment law advice that she represented management only and, therefore, that she could not counsel or advise them concerning their problems.

71.     Krause instead invited them to her office to discuss their employment grievances.

72.     In doing so, Ms. Krause fraudulently held herself out to those DCMA employees as also being a plaintiff-side employment law attorney.

73.     After a DCMA non-management employee finished disclosing to Ms. Krause his or her problem with management and left the attorney suite, Ms. Krause would typically call the employee's supervisor(s) or call Stephen Sloboda, Deputy Commander of the DCMA Manassas CMO, and simply repeat exactly what the employee had told her.

74.     Krause and either the employee's manager or Deputy Commander Sloboda would begin plotting with Krause about how to attack the employee.  They would also often also laugh

13

at, or mock, the employee for having actually sought legal advice from, and confided in, Krause. Only after violating the employee's confidentiality by disclosing the employee's grievances to Sloboda or the employee's management would Krause then subsequently notify the employee that because she represented DCMA management, that she did not represent the employee, and the employee should seek counsel from a union or another attorney.

75.     During one such incident, a female DCMA employee visited Krause for legal counsel after receiving written discipline due to being frequently late to work.

76.      After the employee left Krause's office, Krause vulgarly remarked about the DCMA employee, "Get a bus schedule, b***h… or ride the bus, b***h."

77.     Beginning on or around October 31, 2013, Ms. Koogler began reporting Krause's misconduct described herein to Faris and DCMA General Counsel Sharron Philo and asked Ms. Faris and Ms. Philo to telework from a different DCMA office, located physically away from Ms. Krause.

78.     After Faris denied Ms. Koogler's requests to telework from an available DCMA office in North Carolina, away from Krause, Ms. Koogler resigned from DCMA in 2014.

79.     Krause's other subordinate, Katie O'Connor, after filing her own written complaint with Faris and/or attorney Bruce Krasker about Krause, held onto her job at the DCMA Manassas CMO long enough to, in or around 2014, obtain a transfer to a lateral attorney position with DCMA International in Houston, Texas, very far away from Ms. Krause.

**Stephen Sloboda**

80.     The Commander of a particular CMO or Region determines whether claims such as Koogler's or O'Connor's concerning a CMO employee will be taken seriously and investigated.

14

81.     The Commander of a CMO is an active duty military officer serving in that position for only a temporary two-year or three-year period before being rotated elsewhere.

82.     As a permanent civilian employee in the position of DCMA Manassas CMO Deputy Commander, Sloboda's advice and counsel are closely relied upon by the DCMA Manassas CMO Commander.

83.     At times, Sloboda effectively acts like the Commander, particularly when he is working under a newly-appointed Commander.

84.     On knowledge and belief, in or around 2014, Krause began carrying on an inappropriate personal relationship with Sloboda.

85.     Krause's allegedly "romantic" exploitation of Mr. Sloboda caused Sloboda to abuse his authority over investigations at the Manassas CMO, thus insulating Krause from a full, comprehensive investigation into written complaints filed by O'Connor and Koogler concerning Krause.

86.     In or around October 2013, and again between March and May 2014, Katie O'Connor and Tiffany Koogler reported Ms. Krause's criminal and unethical conduct to Faris, Philo, and DCMA Director Lt. General Wendy Masiello.

87.     Following a 2014 investigation of O'Connor's and Koogler's complaints of gross criminal, dishonest, and unbecoming conduct, DCMA issued Whitney Krause a mere reprimand.

88.     After Krause appealed the reprimand, DCMA rescinded and removed the reprimand from Krause's Official Personnel File.

89.     Sloboda helped Krause retaliate against Koogler by approving Krause's request to move her to a desk outside the legal suite where her whereabouts were monitored.

90.     Krause's "romantic" exploitation of Mr. Sloboda has also ensured that employees who brought to Krause's attention legitimate labor grievances against managers would find their allegations not investigated.

### Attorney Whitney Krause's refusal to provide legal services

91.     Krause frequently allowed the reimbursement of millions of dollars of otherwise disallowable costs to contractors (to avoid tangling with their well-heeled K Street government contracts law firms), and frequently directed her team members to do likewise.

92.     In 2013, a contracts supervisor, Richard Piercy, accepted a transfer to the DCMA Manassas CMO to supervise about fifteen contracting officers and administrators.[28]

93.     Mr. Piercy purchased a house in Prince William County in 2014.[29]

94.     One of Mr. Piercy's employees stopped regularly coming to work, sometimes called in sick as late as 3:00 pm in the afternoon, and he knew her health was not the cause.

95.     Mr. Piercy visited Whitney Krause, the designated employment law attorney for the DCMA Manassas CMO, for legal advice about how to proceed concerning the chronically absentee employee.

96.     Mr. Piercy told Krause that this employee had repeatedly given him poor excuses for missing work, and that he had given her several chances already to remain employed.

97.     Instead of advising Mr. Piercy about how to handle his chronically absentee employee, Krause instead began having a conversation about herself.

---

[28] *Richard B. Piercy*, CBCA 5413-RELO at 1 (BCA Feb. 28, 2017), *available at* https://www.cbca.gov/files/decisions/2017/ZISCHKAU_02-28-17_5413-RELO-R__RICHARD_B_PIERCY.pdf.

[29] *Prince William and Stafford counties home sales*, *Washington Post*, Apr. 24, 2014, *available at* https://www.washingtonpost.com/local/prince-william-and-stafford-counties-home-sales/2014/04/24/1ca966ce-ca64-11e3-93eb-6c0037dde2ad_story.html?utm_term=.fb8ee67b73bd

98.     At some point, Mr. Piercy interrupted Krause to matter-of-factly ask her what he should do about the frequently absent employee.

99.     When Krause just continued talking about herself anyway, Mr. Piercy left and said that he would contact her later about this matter, still unsure about how to proceed.

100.    Krause afterwards ignored his phone calls, emails and visits to her office.

101.    Approximately five or six weeks after his initial visit to Krause, he contacted her supervisor, JeanMarie Faris, to report that he needed legal advice and that Krause was ignoring his phone calls and emails and refusing to see him.

102.    Rather than discipline Krause or make her help him, Faris instead simply relayed his complaint to Krause.

103.    Krause, angry about being criticized by Mr. Piercy for refusing to work, decided to bring Mr. Piercy's career to a close.

104.    Krause began by complaining about Mr. Piercy to his supervisor, DCMA Manassas CMO Deputy Commander Stephen Sloboda.

105.    Mr. Sloboda immediately scheduled a meeting with Mr. Piercy at Sloboda's office.

106.    The meeting comprised Sloboda yelling at, berating, and belittling Mr. Piercy.

107.    Mr. Piercy left Sloboda's office quite distressed and disoriented; he had no idea why Sloboda verbally attacked him.

108.    On or about March 13, 2014, O'Connor relayed a request from Piercy to Krause to prepare a Letter of Warning and Instruction (LOWI) to issue to his absentee employee.

109.    By this time, Piercy had been waiting for the LOWI for two months.

110.    Krause responded by summoning O'Connor to her office and screaming at her.

17

111.    O'Connor stated politely that she would not listen to Krause's personal attack on her character and left Krause's office.

112.    Krause followed O'Connor into O'Connor's office and slammed the door.

113.    When Koogler entered O'Connor's office, she observed Krause blocking O'Connor's exit, and O'Connor looking panicked and asking Krause to move.

114.    After Koogler startled Krause by asking O'Connor if O'Connor wanted some "fresh air," she and O'Connor walked each other outside, away from Krause.

115.    Krause coordinated with HR Specialist Debbie Elwood to find the quickest, most efficient ways to discourage Mr. Piercy from continuing to work for DCMA.

116.    Within the year, Mr. Piercy took an unplanned early retirement from DCMA.

117.    In March 2018, Mr. Piercy and his wife sold the Prince William County house he had just recently purchased in 2014.[30]

### J.Q. Doe and Andrea Benoit

118.    Beginning in 1994, J.Q. spent seven years practicing business law with several of America's largest and most prominent law firms.

119.    J.Q. spent another six years as an attorney with the Federal government.

120.    J.Q. next served as a government contracts partner at two law firms.

121.    J.Q. joined DCMA in October 2012 as a GS-13 Assistant Counsel.

122.    Each year from 2012 to 2016, J.Q. received "outstanding" ("5" out of a possible "5") performance evaluations for providing legal advice and counsel concerning CAS.

---

[30] *Prince William and Stafford counties home sales*, *Washington Post*, Mar. 5, 2018, *available at* https://www.washingtonpost.com/local/prince-william-county-home-sales/2018/03/05/8b44e3c2-05e5-11e8-b48c-b07fea957bd5_story.html?utm_term=.29137c84e9d7

123.    J.Q. also received written accolades for her legal advice, leadership and client service from her DCMA clients Corporate Administrative Contracting Officers ("CACOs"), Divisional Administrative Contracting Officers ("DACOs"), and other DCMA officials.

124.    J.Q. accepted a promotion to GS-14 Associate Counsel in 2014.

125.    Benoit began working for DCMA's predecessor organization, DCMC, in 1995.

126.    Benoit's understanding of CAS was so low when she served as a GS-13 Assistant Counsel in the Boston DCMA office that CACOs and DACOs servicing Raytheon and other companies described her as "horrible" and requested that she be replaced.

127.    On an unspecified date, EEO officer Gerard Francis abruptly ended a meeting with Benoit by telling her to get out of his office.

128.    Benoit responded by filing a frivolous and malicious EEO complaint against him.

129.    Benoit tried to get her coworkers in the DCMA Boston CMO General Counsel's office to submit false statements accusing Francis of harassing female DCMA employees.

130.    Either Benoit withdrew her EEO complaint, or an EEOC or Agency Administrative Judge eventually dismissed it as meritless.

131.    In January 2013, Ms. Benoit left DCMA to accept a promotion to a GS-14 attorney position with the U.S. Army NSRDEC in Natick, MA.

132.    In February 2015, JeanMarie Faris stepped down from her position as DCMA Eastern Regional Counsel, and J.Q. applied for the position vacated by Faris.

133.    The list of required qualifications in the USAJOBS.gov vacancy description for this position description included management experience, expert knowledge of government contracts law, and in-depth knowledge of cost accounting standards (CAS).

134.   While at Army NSRDEC, Ms. Benoit also applied for the GS-15 DCMA Eastern Regional Command Counsel position vacated by JeanMarie Faris.

135.   Unlike J.Q., Ms. Benoit had no management experience.

136.   Benoit and Faris had known one another for nearly twenty years.

137.   Benoit, Faris, and Faris' deputy, Kathleen Malone, often went shopping with one another and visited one another's homes on the weekends.

138.   Faris falsely told interim DCMA General Counsel Keisha Bell that J.Q. had a "personality" problem," and that Bell should hire Benoit for the vacant position instead.

139.   DCMA hired Benoit as Eastern Regional Command Counsel in September 2015.

140.   J.Q. openly criticized the selection of Benoit due to Benoit's lack of required qualifications and what she deemed to be Benoit's general unfitness.

141.   Benoit subsequently advised J.Q. to consider seeking employment elsewhere.

142.   DCMA hired, at double pay, retired annuitant and former DCMA Eastern Regional Command Bruce Krasker, as a consultant in the DCMA Eastern Regional Command legal office specifically to supervise Benoit and teach Benoit how to do her job.

143.   After Benoit's hire, J.Q. and attorney Elizabeth Kafel were required to meet regularly with Benoit to provide Benoit a "crash course" in CAS and contract law.

144.   On an unspecified date in 2016, Malone hastily scribbled and passed Benoit notes on contract law to enable Benoit to intelligently conduct a teleconference about CAS.

145.   In May 2016, J.Q. received a geographic transfer away from Benoit and the Eastern Regional Command legal office to the DCMA Manassas CMO.

146.   Once in Chantilly, Virginia, J.Q. received a windowed office.

147.    The location of J.Q.'s sunlit office placed her on the other side of the legal suite, away from the offices occupied by Krause, Slicker, and a male attorney.

148.    For that reason, and because they did not work together on group assignments, Krause and Slicker had no regular or recurring daily interaction with J.Q.

149.    Krause and Slicker rarely saw J.Q. outside of scheduled meetings.

150.    In June 2016, DCMA promulgated DCMA Instruction 563.

151.    DCMA Instruction 563 made no mention of protections for the civil liberties of DCMA employees and contractors despite President Obama's express language in E.O. 13,587.

152.    Neither DCMA nor DoD DPCLD Chief Mary Fletcher submitted DCMA Instruction 563 to the Privacy and Civil Liberties Oversight Board before DCMA promulgated it.

153.    The aforementioned male government contracts attorney working with Krause and Slicker told Eastern Regional Command counsel Benoit that Slicker had verbally insulted and berated him and that he did not have to tolerate her humiliating him.

154.    After realizing that Benoit never disciplined Slicker, he found employment with another federal agency and left DCMA in or around October 2016.

**Defendant Benoit's abuse of DCMA's Insider Threat reporting apparatus to chill Plaintiff J.Q. Doe's speech and damage Plaintiff J.Q. Doe's professional reputation**

155.    Several DCMA contracting officers, including several of J.Q.'s CACO and DACO clients, held a scheduled telephone call on October 16, 2016.

156.    J.Q. normally attended such calls but was unavailable that day.

157.    Unbeknownst to J.Q., Ms. Krause and Ms. Slicker attended the call.

158.    After a CACO complained about incompetent legal representation he received from a DCMA attorney, Tina Slicker asked the CACO, "Was it J.Q. Doe?"

159.    On or about November 18, 2016, another DCMA contracting officer present on the call told J.Q. that Ms. Slicker asked whether J.Q. was the particularly incompetent attorney another caller complained about.

160.    J.Q. Doe informed Slicker in an email message on November 18, 2016, that she simply would not tolerate being slandered. ("I am not sure why you asked if the counsel was J.Q. Doe … Such behavior is unacceptable to me and will not be tolerated.")

161.    In her November 18, 2018 email response to J.Q., Slicker stated, "I have no idea what you are talking about and why you would accuse me of such behavior - which did not occur.  During the NG briefing no one complained about any attorney.  What you stated did not occur."

162.    Krause and Slicker subsequently notified Benoit by email that that they found J.Q.'s behavior threatening and erratic, and that they were "afraid" of working with J.Q.

163.    Ms. Slicker's email stated, in part, "DCMA has an obligation and duty to provide me with a safe and inclusive workspace and to protect me from [J.Q. 's] increasingly unprofessional, paranoid and aggressive behavior towards me ...."

164.    In her email message, Slicker acknowledged being afflicted with post-traumatic stress disorder and claimed that J.Q.'s presence exacerbated her PTSD.

165.    In one part of her email message to Ms. Benoit, Slicker denied J.Q.'s allegation that Slicker asked someone during the call whether the incompetent attorney was J.Q.

166.    Inexplicably, in another part of the same email message to Ms. Benoit, Slicker contradicted herself by acknowledging to Ms. Benoit that Slicker <u>did</u> actually ask whether "J.Q. Doe" was the attorney the person was complaining about.

167.    Despite both Krause and Slicker acknowledging in their emails to Benoit that they "rarely" saw or spoke with J.Q.,  they both also contradicted themselves by writing that they were "always" having to tell J.Q. to stop saying and thinking "erratic" and "irrational" things.

168.    Neither Krause's nor Slicker's emails suggest that J.Q. attempted to transmit classified Government information to America's enemies.

169.    Neither Krause's or Slicker's emails suggest that J.Q. was the kind of disgruntled, disillusioned, or disloyal employee likely to be "triggered" into committing an act of espionage described in the studies and literature concerning insider threats.[31]

170.    Even assuming *arguendo* that Slicker's and Krause's patently false allegations were true, they would describe at worst workplace intimidation, not terrorism or espionage.

171.    According to the relevant DOD workplace intimidation policy, a supervisor must report intimidation or other disruptive behavior to management and to appropriate military or civilian authorities as determined by local threat reporting protocol.[32]

172.    The Insider Threat Program Manager was not, per local reporting protocol, the appropriate civilian authority whom to report workplace intimidation at DCMA.

173.    Andrea Benoit nonetheless subsequently filed an Insider Threat Report against J.Q., allegedly based on Slicker's and Krause's plainly deceptive and contradictory email pleas for "help."

174.    Benoit later asserted that she was obligated, per DCMA Instruction 563, to file an Insider Threat Report based on, *inter alia*, Tina Slicker's email.

---

[31] Karen Elizabeth Sims, *Unauthorized Disclosure: Can Behavioral Indicators Help Predict Who Will Commit Unauthorized Disclosure of Classified National Security Information*, *Homeland Security Affairs* (August 2015), https://www.hsaj.org/articles/5530. *Homeland Security Affairs* is the online journal of the Center for Homeland Defense and Security at the Naval Postgraduate School (NPS) Center for Homeland Defense and Security.

[32] DOD Instruction 1438.06, Enclosure 3, para.1.b. (2014).

175.     Benoit specifically pointed to two indicators under Table 4 ("Reportable Potentially Violent Behavior Indicators") which she said she believed applied to J.Q.'s behavior as of November 22, 2016, "Intimidating, belligerent, harassing, bullying or other inappropriate and aggressive behavior," and "Numerous conflicts with supervisors and other employees."

176.     DCMA Instruction 563 requires the prompt and detailed reporting of "suspicious and/or anomalous activities/behaviors potentially *indicative of an insider threat*."[33]

177.     DCMA Instruction 563 did not authorize Benoit to report to the Insider Threat Program Manager activity she knew to be unrelated to potential espionage, terrorism, embezzlement, or forms of treason.

178.     Benoit has never explained why, per DODI 1438.06,  she did not report J.Q.'s alleged workplace intimidation to the DCMA Office of General Counsel instead.

179.     On knowledge and belief, Benoit's allegedly deeply personal, long-standing connections with various male officials[34] in the DCMA investigative offices facilitated the initiation of an official investigation into Benoit's dubious "insider threat" allegation against J.Q.

180.     On November 22, 2016, two days before Thanksgiving, DCMA ordered J.Q. to physically remove herself from the DCMA Manassas CMO office indefinitely pending the outcome of an investigation.

181.     DCMA investigator Scott Faucett conducted a six-hour "insider threat" interrogation of J.Q. on December 14, 2016.

---

[33] *Id*. at 8. (emphasis added).

[34] On knowledge and belief, Richard Hermann, a security officer in the DCMA Eastern Regional Command office, used taxpayer-provided resources to conduct surveillance of Benoit's ex-husband for Benoit while Benoit was in the process of divorcing her then-husband.

182.     On knowledge and belief, during the investigation, DCMA investigators asked J.Q.'s coworkers whether J.Q. seemed "disgruntled," if her behavior or conduct was "threatening" or "erratic," or if she seemed interested in espionage, crime, or terrorism.

183.     Once J.Q. learned what an insider threat was, J.Q. was terrified to learn that DCMA had been investigating to determine whether she posed an insider threat.

184.     J.Q., who had been applying for other attorney jobs for several months, missed an opportunity to speak with Contract Disputes Resolution Center (CDRC) Arthur Taylor and other CDRC attorneys about CDRC vacancies at the December 2016 holiday party because J.Q. was still barred from physically entering the Manassas CMO building.

185.     On January 25, 2017, DCMA notified J.Q. that J.Q. could physically return to work full-time in the DCMA Manassas CMO building.

186.     J.Q. was afraid to be alone with either Whitney Krause or Tina Slicker for fear that they would make further false allegations about J.Q. that would lead to additional investigations and attendant, disruptive suspensions from work.

## J.Q.'s Freedom of Information Act Requests

187.     DCMA concluded in January 2017 that J.Q. was never an insider threat.

188.     DCMA refused to provide J.Q. her "insider threat" investigation report.

189.     On January 27, 2017, J.Q., through her attorney, made a FOIA request to DCMA for the "insider threat" investigation report.

190.     In a letter dated August 15, 2017, the Office of the Secretary of Defense acknowledged receipt of this request and that it had been assigned FOIA Request No. 17-F-1472.

191.     In the same letter, the Defense Department, citing 5 U.S.C. § 552(b)(2), (5), (6), (7)(A), and (7)(C), refused to release any responsive documents or data.

192.     This letter expressed multiple errors of law and fact.

193.     On September 20, 2017, J.Q., through counsel, timely appealed FOIA Request No. 17-F-1472.

194.     On November 30, 2017, J.Q., through her attorney, submitted two written FOIA requests concerning DCMA hiring practices for attorneys.

195.     J.Q. has never received a FOIA Request number – or a response – concerning her FOIA requests submitted on November 30, 2017.

196.     On May 27, 2018, J.Q., through her attorney, inquired about the status of FOIA Request No. 17-F-1472.

197.     On August 7, 2018, DCMA notified J.Q. that her outstanding FOIA Request had been assigned control number 17-060 and asked whether J.Q. was still interested in documents responsive to her FOIA Request.

198.     J.Q. timely answered in the affirmative.

199.     Neither DCMA nor the Defense Department have produced any documents to J.Q. responsive to either of J.Q.'s outstanding FOIA Requests.

**Benoit's actions to damage Plaintiff's professional reputation with her new employer**

200.     After returning to work at the DCMA Manassas CMO building in 2017, J.Q. intensified efforts to find other employment outside DCMA.

201.     On or about March 30, 2017, J.Q. was offered a GS-14 position with her current employer, another Defense Department agency.

202.     In July 2017, J.Q. left DCMA and joined her current employer.

203.    Unbeknownst to J.Q., approximately two weeks after she left DCMA, Benoit directed other John Does No. 1 – 10 (other DCMA officials or employees) to notify the security office of J.Q.'s current employer that J.Q. had been the subject of an "insider threat" evaluation.

204.    Benoit did this despite knowing that DCMA already concluded J.Q. was not an insider threat.

205.    Neither Benoit nor John Does Nos. 1 -10 told J.Q.'s current employer that DCMA determined by January 2017 that J.Q. was never an insider threat.

206.    Unbeknownst to J.Q., DCMA's notification prompted Plaintiff J.Q's current employer to initiate a new suitability evaluation or investigation of J.Q.

207.    Unbeknownst to J.Q., the security office of her current employer notified J.Q.'s current first-level and second-level supervisors that J.Q.'s security clearance had been flagged, based on the information Benoit and other unknown DCMA employees provided.

208.    J.Q.'s lack of a secret clearance during that time limited the nature of the work that J.Q.'s first-level supervisor and second-level supervisor could assign J.Q., thereby angering and frustrating them and making them suspicious.

209.    In an August 2017 staff meeting, J.Q.'s second-level supervisor derided as "stupid" new employees who knowingly joined his staff with a security clearance delay or issue.

210.    On knowledge and belief, J.Q.'s second-level supervisor went on to give J.Q.'s potential employers negative references about J.Q. as a result.

211.    On May 24, 2018, Plaintiff's current employer notified J.Q. that her security background investigation, a Tier 3 (T3) investigation, had been completed by OPM and favorably adjudicated for Secret clearance eligibility.

212.    J.Q. had been completely unaware that her current employer was conducting a suitability evaluation of her.

213.    J.Q. learned that Ms. Deborah Britt, Security Manager at DCMA, notified Plaintiff's current employer about the DCMA insider threat investigation and that the suitability investigation delayed J.Q.'s receipt of a Secret clearance from her current employer by ten months.

214.    In June 2018, J.Q.'s first-level supervisor notified J.Q. that her performance evaluation rating for the year 2017 would be a "3" out of a possible "5."

215.    A federal agency attorney generally requires performance evaluations of "5" out of "5" to obtain career advancement above the GS-14 level.

216.    The "insider threat" stigma attached to J.Q. thus derailed her dreams of being elevated to the position of an Administrative Judge on the Armed Services Board of Contract Appeals ("ASBCA"),[35] to some other GS-15 or Senior Executive Services position, or even to employment as a government contracts attorney with a private sector company.

217.    J.Q. asked her current first-level supervisor whether he could consider written letters of recommendation from her clients at DCMA (from the first half of the evaluation year, when she worked at DCMA) in reconsidering what her performance evaluation should be for the entire 2017 year (including the second half, during which she worked for her new employer).

218.    Her current first-level supervisor said that he did not want to contact DCMA for any reason, considering there had been a "security issue" at DCMA involving J.Q.

---

[35] The ASBCA has required that an attorney be employed as a GS-15 level government contracts attorney for at least five years before becoming eligible for hire as an ASBCA Administrative Judge.

219.    He insinuated that J.Q.'s delayed receipt of a Secret clearance was one reason that her superior work performance at DCMA – performance documented as superior based on client feedback for the half of the year she spent at DCMA before transferring to her current employer– could not be considered at all in her annual rating.

220.    J.Q.'s current first-level supervisor stated that he did not want to have to contact DCMA because he believed that doing so would lead him to receive adverse information about J.Q. that DCMA had entered into JPAS.

221.    J.Q.'s current first-level supervisor then remarked about J.Q., "Although you haven't been disruptive *here*."

222.    Receiving a relatively lower performance rating than normal caused J.Q. to receive a much smaller performance rating cash bonus than she anticipated for 2017-18.

223.    On one occasion, J.Q.'s second-level supervisor opined that filing complaints about persons not suspected of espionage, crime, or terrorism was, nevertheless, a good use of an Agency's Insider Threat program given that those persons were probably causing other problems anyway.

224.    On or about August 21, 2018, the Pentagon Force Protection Agency recognized the DCMA Manassas CMO with an award for Best Antiterrorism Program in a small Department of Defense facility.[36]

225.    The article quoted Deputy Commander Stephen Sloboda as follows:

> Receiving this honor is especially rewarding for a small field activity such as
> ourselves.   We are not staffed to perform many of the unique security roles and
> responsibilities expected of federal agencies in the National Capitol Region.  It is
> a credit to the dedication and diligence of our office, the Eastern Region and the
> headquarters' staff, that we are able to accomplish so much.

---

[36] Tonya Johnson, *DCMA Manassas wins antiterrorism award*, DCMA (Sept. 25, 2018), http://www.dcma.mil/News/Article-View/Article/1626301/dcma-manassas-wins-antiterrism-award/

226.    On November 30, 2018, DCMA issued DCMA Manual 3301-05, a new insider threat regulation.[37]

227.    DCMA Manual 3301-05 canceled DCMA Instruction 563 and expressly established the Insider Threat Program at DCMA as compliant with Executive Order 13,587.[38]

228.    Unlike DCMA Instruction 563, DCMA Manual 3301-05 required DCMA to: (a) train personnel implementing the Insider Threat program in "Privacy and Civil Liberties": (b) respect civil liberties and privacy protections; (c) require the Chief Civil Liberties Officer to review Insider Threat processes and procedures for compliance with laws and DoD policies; (d) provide privacy and civil liberties advice, guidance, training and other related support to the Insider Threat program and to management officials responding to actual or potential Insider Threat matters; (e) provide annual privacy and civil liberties training annually to designated Insider Threat personnel and Threat Management Team members; (f) provide privacy and civil liberties support to program reviews and the annual Insider Threat Report; (g) leverage the unique training, expertise and capabilities of DCMA's privacy and civil liberties staffs when responding to actual or suspected Insider Threat matters; and (g) compartmentalize Insider Threat "hub" activities to safeguard the integrity of Insider Threat information to ensure privacy and civil liberties protections.[39]

---

[37] DCMA Manual 3301-05, DEFENSE CONTRACT MANAGEMENT AGENCY, *available at* https://www.dcma.mil/Portals/31/Documents/Policy/DCMA-MAN-3301-05.pdf?ver=2018-12-14-100501-933.

[38] *Id.* at 1.

[39] *Id*. §§ 1.2, 2.12, 2.14, 3.5.

229.    Despite all Benoit did, J.Q. nevertheless contemplated returning to DCMA – outside the Office of the General Counsel – because she missed the kind of contract work at DCMA and many of the people she met and worked with.

230.    During the week of March 18, 2019, J.Q. visited the DCMA Manassas CMO as required by her employer to observe a DCMA trial attorney's defense of several depositions.

231.    The DCMA trial attorney defending the depositions never gave J.Q., who was now, for the first time, a visitor to the DCMA Manassas CMO, instructions on when and where to report to the building to obtain a visitor's security badge.

232.    Consequently, after waiting outside and attempting to reach someone via intercom for that purpose, J.Q. walked through the open public area of the building to the locked DCMA legal suite, and waited for someone to exit.

233.    J.Q. asked the first person who exited the DCMA legal suite to escort her to the CMO Commander's suite so that she could check in at the visitor's desk.

234.    While at the visitor's check-in desk, she received a visitor badge.

235.    J.Q. was neither instructed to return the visitor badge at the end of each day nor notified that she would have to check-in each day to receive a new visitor's badge.

236.    While defending the depositions in the DCMA legal suite, the DCMA trial attorney refused to let J.Q. sit on the same side of the table with him and with the deponents.

237.    At one point during the week, inside the legal suite – where J.Q. was authorized to be – Whitney Krause and J.Q. crossed paths.

238.    Krause complained to Sloboda that J.Q. was "wandering the hallways."

239.    Sloboda told Arthur Taylor that J.Q. violated CMO building security protocols.

240.    Taylor, in turn, reported J.Q.'s alleged "violation of security protocols" to J.Q.'s current first-line supervisor at J.Q.'s current employer.

241.    During a CDRC video conference call on held or about April 10, 2019, Taylor reminded the participants that DCMA attorneys must ensure that visitors to DCMA buildings follow DCMA building security protocols.

242.    The DCMA attorney who defended the depositions during the week of March 18, 2019, responded that he could not held be responsible for "babysitting" a "disgruntled former employee."

243.    J.Q. has had dozens of unsuccessful government contracts attorney job interviews since her current employer learned of the insider threat investigation.

## COUNT I – CONSTRUCTIVE RECORDS DENIAL – 17-F-1472 (FREEDOM OF INFORMATION ACT, 5 U.S.C. § 552), DEPARTMENT OF DEFENSE AND DEF. CONTRACT MANAGEMENT AGENCY

244.    Plaintiff repeats and realleges the allegations expressed in the paragraphs set forth above.

245.    On January 27, 2017, J.Q. made a FOIA request to DCMA for the "insider threat" investigation report.

246.    In a letter dated August 15, 2017, the Office of the Secretary of Defense acknowledged receipt of this request and that it had been assigned FOIA Request No. 17-F-1472.

247.    In the same letter, the DoD, citing 5 U.S.C. § 552(b)(2), (5), (6), (7)(A), and (7)(C), refused to release any responsive documents or data.

248.    On September 20, 2017, J.Q., through counsel, timely appealed FOIA Request No. 17-F-1472.

249.    On May 27, 2018, J.Q., through her attorney, inquired about the status of FOIA Request No. 17-F-1472.

250.    On August 7, 2018, DCMA notified J.Q. that her outstanding FOIA Request had been assigned control number 17-060 and asked whether J.Q. was still interested in documents responsive to her FOIA Request.

251.    J.Q. timely answered in the affirmative.

252.    As of the date of this filing, neither DCMA nor the Defense Department have produced any documents responsive to any of J.Q.'s outstanding FOIA Requests.

253.    As more than twenty working days have elapsed without a substantive determination by either DCMA or the Defense Department, J.Q. has exhausted all required administrative remedies under FOIA.

254.    J.Q. has a legal right under FOIA to obtain the information she seeks, and no legal basis exists for the denial by DCMA and the Defense Department of said right.

## COUNT II – CONSTRUCTIVE RECORDS DENIAL – NO REQUEST NUMBER (FREEDOM OF INFORMATION ACT, 5 U.S.C. § 552) DEPARTMENT OF DEFENSE AND DEF. CONTRACT MANAGEMENT AGENCY

255.    Plaintiff repeats and realleges the allegations expressed in the paragraphs set forth above.

256.    On November 30, 2017, J.Q., through her attorney, submitted two written FOIA requests to DCMA concerning DCMA hiring practices for attorneys.

257.    J.Q. has never received a FOIA Request number – or a response – concerning her FOIA requests submitted on November 30, 2017.

258.     As more than twenty working days have elapsed without a substantive determination by either DCMA or DoD, J.Q. has exhausted all required administrative remedies pertaining to FOIA.

259.     J.Q. has a legal right under FOIA to obtain the information she seeks, and no legal basis exists for the denial by DCMA and the Defense Department of said right.

**COUNT III – PROMULGATON OF AN EXECUTIVE ORDER INCONSISTENT WITH ITS AUTHORIZING EXECUTIVE ORDER,**
***SHERLEY V. SEBELIUS*, 776 F. SUPP. 2D 1 (D.D.C. 2011)**
**DEPARTMENT OF DEFENSE AND DEF. CONTRACT MANAGEMENT AGENCY**

260.     Plaintiff repeats and realleges the allegations expressed in the paragraphs set forth above.

261.     Andrea Benoit claimed that DCMA Instruction 563 obligated her to file an Insider Threat complaint against J.Q. Doe.

262.     DCMA promulgated DCMA Instruction 563 one month after J.Q. left Benoit's supervisory chain and transferred to the DCMA Manassas CMO.

263.     DCMA composed DCMA Instruction 563 so that "intimidating behavior" and "conflicts with supervisors" became indicia of insider threats, inconsistent with E.O. 13,587.

264.     On knowledge and belief, Benoit contributed to creating DCMA Instruction 563.

265.     On knowledge and belief, DCMA promulgated DCMA Instruction 563 to satisfy Benoit's desire to fraudulently, frivolously and maliciously report J.Q. as an insider threat.

266.     DCMA promulgated DCMA Manual 3301-05 in or around November 30, 2018.

267.     In promulgating DCMA Manual 3301-05, DCMA indicated that its purpose was to establish an Insider Threat Program compliant with Executive Order 13,587.

268.     By using DCMA Manual 3301-05 to cancel DCMA Instruction 563, DCMA effectively indicated that DCMA Instruction 563 did not comply with Executive Order 13,587.

269.    DCMA Manual 3301-05 specifically provides for multiple layers of other protections for the privacy and civil liberties of DCMA employees, contractors, and volunteers.

270.    By contrast, DCMA Instruction 563 provided no protections for their civil liberties, despite President Barack Obama's express mandate in Executive Order 13,587.

271.    A regulation that is inconsistent with the Executive Order that authorizes the regulation's promulgation is unlawful.[40]

272.    DCMA Instruction 563, which is inconsistent with Executive Order 13,587, was, therefore, unlawful.

273.    Because they were authorized by the unlawful DCMA Instruction 563, Benoit's insider threat complaint, and the investigation that followed, were also unlawful.

274.    For those reasons, Plaintiff is entitled to a declaratory judgment that the insider threat complaint and attendant investigation and investigation report were invalid, and to an order rescinding or expunging and removing the filing of the complaint and subsequent investigation and findings from any personnel or security files or records concerning J.Q.[41]

**COUNT IV – FIRST AMENDMENT (FREE SPEECH), *BIVENS V. SIX UNKNOWN NAMED AGENTS*, 403 U.S. 388 (1971) ANDREA LYNNE BENOIT**

275.    Plaintiff repeats and realleges the allegations expressed in the paragraphs set forth above.

---

[40] *Sherley v. Sebelius*, 776 F. Supp. 2d 1, 23 (D.D.C. 2011); *accord Peters v. Hobby*, 349 U.S. 331, 345-46 (1955).

[41] 349 U.S. at 348-49.

276.     According to the Department of Defense, civil liberties are fundamental rights and freedoms protected by the Constitution of the United States.[42]

277.     The right to free speech is a cherished civil liberty.

278.     On or about November 18, 2018, J.Q. notified Tina Slicker by email that she was not going to tolerate being slandered by Slicker.

279.     J.Q. never expressed any threat of violence against Slicker in her email.

280.     J.Q. has never threatened violence, attempted to commit violence, or committed violence against Slicker, Krause, Benoit, or any other DCMA official or employee.

281.     J.Q. has never posed any threat to national security.

282.     J.Q. was not criticizing her employer, DCMA, in this email.

283.     In this email, J.Q. attempted to hold Slicker accountable for being abrasive with J.Q.'s clients and for providing them with confusing information.

284.     J.Q. transmitted this email message to Tina Slicker after work hours.

285.     J.Q. was neither Slicker's nor Krause's team leader or supervisor.

286.     Overseeing the veracity of communications made by Slicker or Krause to contracting officers was not within J.Q.'s express or implied job responsibilities.

287.     Slicker and Krause provided internally contradictory and false written statements to Andrea Benoit about feeling threatened for their lives due to J.Q.'s presence and conduct.

288.     Notably, in the same email to Benoit in which Slicker denied asking whether J.Q. was the attorney being accused of incompetence, Slicker subsequently admitted that she did ask whether the DCMA attorney being accused of incompetence "was [J.Q. Doe]."

---

[42] Defense Privacy, Civil Liberties, and Transparency Division, *Civil Liberties*, U.S. DEPARTMENT OF DEFENSE, https://dpcld.defense.gov/Civil-Liberties/

36

289.    Two such conflicting statements call Slicker's credibility into question.

290.    Based on Slicker's misuse of government computers and time card fraud, Benoit was also aware that Slicker is untrustworthy.

291.    Based on Krause's history, Benoit knew that Krause is not only criminally untrustworthy and dishonest, but that her unethical actions make her unfit to practice law.

292.    One of DCMA Manassas CMO's challenges is retaining experienced contract specialists due to competition in the National Capital Area labor market.[43]

293.    Without justification or repercussions, Krause and Slicker verbally abused CMO attorneys and employees to the point that they felt compelled to find employment elsewhere.

294.    With Deputy Commander Sloboda's help, Krause compelled a valuable employee to take early retirement, simply for asking her to do her job to provide legal advice.

295.    DCMA oversees the performance of billions of dollars of DoD contracts.

296.    Only about 3000 attorneys practice federal contracts law in the United States.

297.    Krause's and Slicker's misconduct caused at least four Manassas attorneys to leave, thereby creating a shortage of government contracts attorneys at DCMA's busiest CMO.

298.    Replacing an employee can cost as much as 6 to 9 months of his or her salary.[44]

299.    Krause's and Slicker's bizarre behavior, together with the shortage of attorneys, caused contracting personnel to go without seeking legal advice.

---

[43] Karen R. Penn, *A Renewed Focus on Recruitment*, Defense AT&L, DEFENSE ACQUISITION UNIVERSITY, Mar.-Apr. 2011, *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/a540602.pdf.

[44] Network of Executive Women, *Advancing All Women: How Women of Color Experience the Workplace*, at 3, https://www.newonline.org/sites/default/files/files/NEW_AdvancingAllWomen.pdf citing  Christina Merhar, *Employee Retention – The Real Cost of Losing an Employee*, PeopleKeep, Feb. 4, 2016, https://www.peoplekeep.com/blog/bid/312123/employee-retention-the-real-cost-of-losing-an-employee

300.     Going without legal advice led CACOs and DACOs to reimburse to government contractors (at cost to the DoD and to taxpayers) hundreds of millions of dollars in costs - costs that they would probably have  disallowed had they received sound legal advice.[45]

301.     Whether DCMA is operating efficiently and judiciously utilizing billions of dollars in taxpayer funds and other resources are matters of public concern.

302.     Quality legal support or legal review is critical to a CACO's effective function.

303.     Consequently, whether the attorneys DCMA hires to support and counsel DCMA contracting officers are competent is a matter of public concern.

304.     Benoit was aware that Slicker's and Krause's email complaints about J.Q. were so laden with glaring inconsistencies as to be disregarded as false.

305.     DCMA determined by January 2017 that J.Q. was not an Insider Threat.

306.     In July 2017, when Benoit either notified or directed other employees to notify J.Q.'s current employer about the Insider Threat investigation – but not the conclusion that J.Q. was never deemed to be an insider threat – Ms. Benoit was outside J.Q.'s chain of command.

307.     When Benoit committed this action, she lacked the authority to hire J.Q., fire J.Q., fail to promote J.Q., reassign J.Q. to a task with significantly different duties, or cause a significant change in benefits available to J.Q.

---

[45] *See* Report No. DODIG-2018-134, *Evaluation of DoD Hotline Complaint …* (July 9, 2018) at 1, 4, 5, 9, 11 at https://media.defense.gov/2018/Jul/11/2001941172/-1/-1/1/DODIG-2018-134.PDF (after failing to seek legal advice on the applicability of the six-year statute of limitations as DCMA policy requires, a DCMA contracting officer may have reimbursed up to $1.1 million in proposed indirect costs to the DoD contractor that did not comply with the FAR); *see also* Report No. DODIG-2018-128, *Hotline Allegation Regarding the Actions of a Defense Contract Management Agency Contracting Officer on a Subcontractor's Termination Settlement Proposal*, (June 21, 2018) at 7, https://www.oversight.gov/sites/default/files/oig-reports/DODIG-2018-128.pdf ("We reviewed the DCMA contract file and found that the Retired Supervisor did not … document whether he advised the DCMA Contracting Officer to seek legal counsel given her decision not to uphold costs questioned by Plaintiff's current employer, as required by DoD Instruction 7640.02, "Policy for Follow up on Contract Audit Reports," April 15, 2015, and DCMA Instruction 126.").

308.    When Benoit committed this action, she did not oversee J.Q.'s work.

309.    When Benoit committed this action, she lacked the authority to take any other tangible employment actions against J.Q.

310.    Notifying one's current employer about an investigation about him or her is neither a tangible employment action nor an administratively appealable adverse action.

311.    Benoit ensured that J.Q.'s current employer knew about the closed insider threat investigation to chill J.Q.'s speech, specifically J.Q.'s speech that Slicker attempted to slander J.Q., and J.Q.'s speech questioning Benoit's fitness and competence to serve as a manager of federal attorneys.

312.    A public employee retains First Amendment right concerning her speech.

313.    Even though J.Q. was a federal employee at the time, Andrea Benoit's and John Does Nos. 1 – 10's communication of the Insider Threat investigation of J.Q. to her current employer violated J.Q.'s First Amendment rights because the communication was not a personnel action that can be remedied under any Federal statutory scheme.[46]

314.    Andrea Benoit's restriction on Plaintiff's speech was content-based and viewpoint-based, in violation of the Free Speech Clause of the First Amendment.

315.    Benoit's true purpose for notifying J.Q.'s current employer about the insider threat investigation of J.Q. – but not the conclusion that J.Q. was never an insider threat – was to silence the viewpoint expressed by Plaintiff's speech concerning the fitness of Benoit, Slicker, Krause and other DCMA attorneys, and Slicker's attempt to slander J.Q.

---

[46] *See Bush v. Lucas*, 462 U.S. 367, 391 (1983) (Marshall, J., concurring). ("There is nothing in today's decision to foreclose a federal employee from pursuing a Bivens remedy where his injury is not attributable to personnel actions which may be remedied under the federal statutory scheme.").

316.    Consequently, the true purpose for Benoit's decision to notify J.Q.'s current employer about the Insider Threat investigation – but not the conclusion that J.Q. was never determined to be an insider threat – was to silence disfavored viewpoints, in violation of the Free Speech Clause of the First Amendment.

317.    While the Whistleblower Protection Act (WPA) and Whistleblower Protection Enhancement Act (WPEA) bar agencies from engaging in "arbitrary"[47] actions that diverge from Congress' legislative intent, neither Act addresses agency actions based on "unreasonable"[48] interpretations of a President's executive order.

318.    While the WPA and WPEA bar agencies from failing to treat employees fairly and equitably in all aspects of personnel management with proper regard for their privacy and constitutional rights, neither Act addresses agency actions unrelated to personnel management.

319.    Consequently, no statutory scheme exists that remedies or could contemplate remedying a *Bivens* injury arising from a misinterpretation of an Executive Order.

320.    By being outside J.Q.'s management chain, and by committing unlawful acts against J.Q. that were not personnel actions, Benoit and John Does Nos. 1 – 10 subjected themselves to *Bivens* liability for violations of the First Amendment of the Constitution.

321.    As a direct and proximate result of Benoit's violation of the Free Speech Clause of the First Amendment, Plaintiff has suffered irreparable harm, including the loss of her constitutional rights, entitling her to declaratory and injunctive relief and nominal damages.

---

[47] 5 U.S.C. 2302(b)(12);  5 U.S.C. 2301(b)(8); *Chevron U.S.A. v. Natural Resources Def. Council, Inc*., 467 U.S. 837 (1984).

[48] *Udall v. Tallman*, 380 U.S. 1, 18 (1965).

**COUNT V – STIGMA-HARM VIOLATION OF THE FIFTH AMENDMENT
(LIBERTY), *BIVENS V. SIX UNKNOWN NAMED AGENTS*, 403 U.S. 388 (1971)
ANDREA LYNNE BENOIT AND JOHN DOES NO. 1 – 10**

322.     Plaintiff repeats and realleges the allegations expressed in the paragraphs set forth above.

323.     Despite the fact that the DOD had determined J.Q. not to be an "insider threat," Andrea Benoit and/or some other unknown DCMA employees or officials (John Doe Nos. 1-10) directed by, *inter alia*, Benoit, knowingly forwarded the fact of the report, although not the report's conclusion, to Plaintiff's current employer about the insider threat investigation.

324.     This occurred approximately two weeks after J.Q.'s current employer hired J.Q.

325.     J.Q. had a Secret clearance when her current employer hired her.

326.     This notification about an insider threat investigation discontinued of J.Q.'s security clearance for ten months.

327.     J.Q.'s supervisors were notified that she no longer had a Secret clearance because she was being investigated.

328.     J.Q.'s supervisors were frustrated by having to wait for J.Q. to obtain a new Secret clearance.

329.     Plaintiff's current second-level supervisor subsequently referred to new employees with security clearance delays, like J.Q., as "stupid."

330.     In issuing J.Q. a performance rating of "3," J.Q.'s first-level supervisor cited her lack of a security clearance, and information he received about the insider threat investigation.

331.     The lower rating lowered her financial compensation for the year.

332.    The lower annual performance evaluation, coupled with a decrease in earnings, constitutes an adverse action against Plaintiff.[49]

333.    In notifying J.Q.'s current employer about the investigation, Benoit and/or John Doe Nos. 1-10 violated J.Q.'s Fifth Amendment liberty interest in her current employment, damaged her professional reputation within DoD, and caused officials at Plaintiff's current employer to unfairly rate her and refuse to help her find advancement opportunities, thereby entitling her to substantial compensatory and punitive damages.

334.    Benoit and John Does Nos. 1 – 10 were aware in January 2017 that DCMA determined J.Q. did not pose an Insider Threat against DCMA.

335.    Andrea Benoit and John Does Nos. 1 – 10 were not in J.Q.'s management chain when one or more of them directed Deborah Britt or other security officers to notify J.Q.'s current employer about the insider threat complaint against and investigation of J.Q.

336.    Notifying a former employee's current employer about an insider threat investigation of that former employee is not a personnel action.

337.    Because the insider threat investigation was unlawful, publicizing the existence of the investigation to persons outside DCMA was also unlawful.

338.    Andrea Benoit and/or unknown DCMA employees (John Doe Nos. 1-10) directed Deborah Britt to make statements to the security office at J.Q.'s current employer that made J.Q. appear to be a possible insider threat, even though they knew she was not an insider threat.

---

[49] *Russell v. Principi*, 257 F.3d 815 (D.C. Cir. 2001) (a performance evaluation is not an adverse action unless it is accompanied by a reduced performance award).

339.    While the WPA and WPEA bar agencies from engaging in "arbitrary" actions that diverge from Congress' legislative intent neither Act addresses agency actions based on "unreasonable" interpretations of a President's executive order.

340.    While the WPA and WPEA bar agencies from failing to treat employees fairly and equitably in all aspects of personnel management with proper regard for their privacy and constitutional rights, neither Act addresses agency actions unrelated to personnel management.

341.    Consequently, no statutory scheme exists that remedies or could contemplate remedying a *Bivens* injury arising from a misinterpretation of an Executive Order.

342.    By being outside J.Q.'s management chain, and by committing unlawful acts against J.Q. that were not personnel actions, Benoit and John Does Nos. 1 – 10 subjected themselves to *Bivens* liability for violating J.Q.'s liberty interest in her reputation protected by the Fifth Amendment of the Constitution.

343.    Notifying Plaintiff's current employer about the insider threat investigation of Plaintiff, but not about its conclusion that Plaintiff was found to not be an insider threat, constituted an allegation that Plaintiff had been deemed to be a potential insider threat.

344.    This allegation was sufficiently derogatory to injure J.Q.'s reputation, was capable of being proved false, and J.Q. claims this allegation is false.

345.    Andrea Benoit's statement to Plaintiff's current employer, or her order to one or more DCMA employees (John Doe Nos. 1-10) to tell Plaintiff's current employer that Plaintiff posed a possible insider threat deprived J.Q. of a Federal Fifth Amendment constitutional liberty interest in not being falsely stigmatized (a "stigma").

346.    Benoit's statement did not constitute either a tangible employment action or an administratively appealable adverse action.

43

347.    Because J.Q. subsequently received less compensation due to an artificially low performance evaluation prompted by Benoit's or other DCMA employees' report to Plaintiff's current employer, J.Q. did suffer a deprivation of a tangible interest (a "plus").

348.    Because the actions of Benoit and/or unknown DCMA employees caused J.Q.'s current employer to rate her lower, pay her less, and decline to give potential employers favorable recommendations about her, she has been unable to find higher-paying work in the federal or private sector, and thus, is entitled to substantial compensatory and punitive damages.

349.    As a direct and proximate result of Benoit's or other unknown DCMA employees' violation of J.Q.'s Fifth Amendment liberty interest, Plaintiff has suffered irreparable harm, including the loss of her constitutional rights, and damage to her professional reputation (within her current employer, within the DoD Office of the General Counsel, and in the private sector Defense contracts community), entitling her to declaratory and injunctive relief and nominal damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff J.Q. Doe asks this Court to:

(1)    Order the Defense Contract Management Agency, Department of Defense, and any unnamed agencies that may maintain the records pertinent to Plaintiff's FOIA requests to disclose the requested records in their entirety including all records, documents, or files described below in paragraph (2), and make copies promptly available to Plaintiff;

(2)    Order preliminary and permanent injunctive and/or declaratory relief as may be appropriate, including but not limited to a declaratory judgment that the DCMA's Insider Threat investigation of Plaintiff and Plaintiff's two-month debarment from the DCMA Manassas CMO were invalid and unlawful, and the issuance of an Order directing DCMA and DoD to expunge from their security records, personnel records and all other records: (a) findings that Plaintiff created a hostile work environment at DCMA; (b) records of the Insider Threat Complaint filed by Benoit; (c) Insider Threat investigation report of Plaintiff; and (d) all other documents or other results of data mining or Internet searches related to the Insider Threat Investigation of Plaintiff.

(3)     Declare that Andrea Benoit's and John Does Nos. 1 – 10's efforts to restrict Plaintiff's speech and damage Plaintiff's professional reputation violated the First and Fifth Amendments to the U.S. Constitution as set forth in this Complaint;

(4)     Award Plaintiff nominal damages for the past loss of her constitutional rights as set forth in this Complaint;

(5)     Order Andrea Benoit and John Does Nos. 1 – 10 to pay Plaintiff $850,000 million based on the stigmatic harm caused (by notifying her current employer of the Insider Threat investigation) to Plaintiff's professional reputation at her current employer and ability to find future Defense contracts legal work in the private sector;

(6)     Order Benoit to pay Plaintiff an additional $2 million in punitive damages;

(7)     Award Plaintiff reasonable attorney fees, costs, and expenses as provided in 5 U.S.C. § 552(a)(4)(E), 28 U.S.C. § 2412(d), 42 U.S.C. § 1988, and any other applicable law;

(8)     Expedite this action in every way pursuant to 28 U.S.C. § 1657(a);

(9)     Order the Defense Contract Management Agency and the Department of Defense to grant Plaintiff a name clearing hearing;

(10)    Order the Defense Contract Management Agency and the Department of Defense to investigate Whitney Krause's and Andrea Benoit's fitness for current employment;

(11)    Order the Defense Department to hire Plaintiff into a supervisory GS-15, Step 6 or SES position, or higher-compensated supervisory position suitable to Plaintiff; and

(12)    Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

 _/s/ Gerald L. Gilliard_____
Gerald L. Gilliard, Esq.
D.C. Bar. No. 497726
1629 K Street, N.W., Suite 300
Washington, D.C. 20006
Tel.: (202) 829-9753
Fax: (202) 478-1783
E-Mail: ggilliard@employmentlegalteam.com